**Ray REPP and K & R Music, Inc., Plaintiffs,**

v.

**Andrew Lloyd WEBBER, The Really Useful Group, PLC, The Really Useful Company, Inc., MCA Records, Inc., Hal Leonard Publishing Corporation and Polygram Records, Inc., Defendants.**

No. 91 Civ. 906 (SWK).

United States District Court, S.D. New York.

Dec. 3, 1996.

Cherry & Flynn, by William R. Coulson, John M. Leovy, Chicago, IL, for Plaintiffs.

Gold, Farrell & Marks by Jane G. Stevens, Christine Lepera, Mark N. Diller, New York City, for Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KRAM, District Judge.

In this copyright infringement action, counterplaintiffs Andrew Lloyd Webber ("Lloyd Webber"), the Really Useful Group, PLC, and the Really Useful Company, Inc. (together, "Really Useful") seek an injunction preventing counterdefendants from publishing, selling, marketing, recording, performing or otherwise distributing copies of "Till You" in any configuration. On September 16 through September 20, 1996, the Court held a bench trial on these claims. As set forth in the following findings of fact and conclusions of law, the Court finds in favor of counterdefendants Ray Repp ("Repp") and K & R Music, Inc. ("K & R").

### FINDINGS OF FACT AND CONCLUSIONS OF LAW [1]

Lloyd Webber and Really Useful bring these counterclaims against counterdefendants Repp and K & R, alleging copyright infringement pursuant to the Copyright Act of 1976, 17 U.S.C. § 101, et seq. Specifically, Lloyd Webber alleges that Repp's song "Till You" infringed his copyright in "Close Every Door."

In its August 3, 1994 Memorandum Opinion and Order, the Court granted Lloyd Webber's motion for summary judgment dismissing the complaint on the grounds that (1) Repp could not prove that Lloyd Webber had access to "Till You" prior to composing "Phantom of the Opera"; (2) the two songs were not "strikingly similar" as to justify a finding of copying absent access to "Till You"; and (3) Repp did not contradict Lloyd Webber's proof of independent creation. See Repp v. Lloyd Webber, 858 F.Supp. 1292 (S.D.N.Y.1994). In its July 19, 1995 Memorandum Opinion and Order, the Court re-

fused to dismiss the counterclaims, finding that a reasonable trier of fact could infer that Repp had access to the song "Close Every Door" by virtue of its wide dissemination in the public domain prior to the composition of "Till You." In addition, the Court found that an issue of fact existed as to whether the two works were substantially similar. See Repp v. Lloyd Webber, 892 F.Supp. 552, 558 (S.D.N.Y.1995). On August 13, 1996, the Court allowed Lloyd Webber to withdraw his claims for monetary damages.

### FINDINGS OF FACT

#### I. Lloyd Webber and "Close Every Door"

Lloyd Webber, a British citizen who maintains a residence in New York City, is a composer of music for the theater, whose major works include Joseph and the Amazing Technicolor Dreamcoat ("Joseph"), Jesus Christ Superstar, Cats, Evita, Sunset Boulevard and The Phantom of the Opera. Trial Tr. at 285–87. Lloyd Webber has written over 300 songs, including the music for thirteen theatrical productions and two major film scores. Id. at 285–86.

Lloyd Webber originally composed Joseph as a choral work for Colet Court, a London junior school, in 1967 and 1968. Id. at 287–88. The song "Close Every Door" was among the first portions of the choral version to be composed. Id. at 288–89, 301. The original choral version of Joseph, including "Close Every Door," was first presented in 1968 by the Colet Court School. Id. at 290. As a result of the success of this presentation, Lloyd Webber and Tim Rice ("Rice"), the lyricist of the work, received an offer from Novello & Company Ltd. ("Novello") to publish Joseph. Id. at 290.

The original choral version of Joseph was next performed at Westminster Central Hall in London. Id. This performance was reviewed in the Sunday Times of London on May 19, 1968, which specifically described "Close Every Door" as a "very beautiful melody." Exh. LL; Trial Tr. at 290.

---

**1.** The background of this action is set forth fully in Repp v. Lloyd Webber, 858 F.Supp. 1292, 1295–99 (S.D.N.Y.1994), familiarity with which is presumed. Only those facts relevant to the disposition of this opinion shall be recited below.

In 1972, an expanded version of *Joseph* was presented by the Young Vic acting troupe as part of the Edinburgh, Scotland annual festival. *Id.* at 291–93. This version was presented in and around London, first at the Roundhouse Theater in the Chalk Farm district of London, and then at the Albery Theater in the West End theater district. *Id.* at 293–94. This production was reviewed in the Sunday Times of London on March 4, 1973. Exh. MM; Trial Tr. at 305.

Following its London run, Lloyd Webber and Rice expanded *Joseph* a second time into a full-length musical. *Id.* at 293–94. "Close Every Door" has been central to *Joseph* in each of its incarnations, *id.* at 287–89, 295, and the music, including the melody, harmony and rhythm did not change in any of the expansions of *Joseph*, *id.* at 295, 316, 30, 63–64.

Lloyd Webber and Rice assigned their copyright in *Joseph*, including "Close Every Door," to Novello in 1969. Exh. II; Trial Tr. at 164, 296. Really Useful acquired all of Novello's rights and interests in the copyrights in *Joseph*, which included "Close Every Door," and in "Close Every Door" individually, through an assignment consummated in 1989. Exh. U; Trial Tr. at 162–63. Really Useful subsequently recorded the assignment in the United States Copyright Office. *Id.* at 165–67; *see also* Exhs. V, W, X, Y. Through the assignment agreement, Really Useful acquired the right to initiate legal action for infringements of *Joseph* and "Close Every Door" which predated the assignment. Exh. U at ¶1(a). In addition, Really Useful has a continuing royalty interest in the proceeds generated by *Joseph*, including the song "Close Every Door." *See* Exhs. U, II; Trial Tr. at 297–98. The print configurations in which the work *Joseph* or the song "Close Every Door" appear reflect copyright notice listing Really Useful or its predecessor, Novello, as copyright owner. *See* Exhs. C, 1. The sheet music of "Close Every Door" that is attached to the counterclaim and was introduced into evidence at trial bears a copyright notice date of "1969, 1978." *See* Exh. C. The sheet music of "Till You" bears a copyright notice date of "1978." *See* Exh. B.

## II. Repp and "Till You"

Repp is a professional musician primarily engaged in composing, publishing, recording and performing popular liturgical music. He has published eleven albums of music, and his music has been published in about 28 languages other than English. Trial Tr. at 422–23, 426.

In the summer of 1978, Repp started the company K & R. In September 1978, Repp recorded a working tape of a folk song entitled "Till You," basing the lyrics on certain Biblical verses from the Book of Luke. The sheet music of "Till You" has been sold in four books—two renditions entitled *Benedicamus*, and two versions entitled *Life Songs*. *Id.* at 192–94. Repp alleges that he ordered approximately 10,000 to 11,000 copies of *Life Songs*, which sold out in two or three years. *Id.* at 196.

## III. Access

Lloyd Webber suggests several possible avenues through which Repp may have gained access to "Close Every Door," including the widespread dissemination of that song resulting from (1) sales of the Sceptre Records and MCA sound recordings of *Joseph*; (2) sales and distribution of sheet music; (3) amateur and non-Broadway performances; (4) radio airplay; and (5) a production at the Brooklyn Academy of Music. Lloyd Webber also claims that Repp's access to "Close Every Door" is evidenced by: (1) Repp's background and presence in the United States during the period between Lloyd Webber's creation of "Close Every Door" in 1968 and the creation and release of "Till You" in 1978 (the "Access Period"); (2) Repp's awareness of Lloyd Webber and his works generally; (3) Repp's awareness of *Joseph*; (4) Repp's familiarity with works in his genre of composition; and (5) Repp's use of the "door" metaphor in "Till You."

### A. Dissemination of "Close Every Door"

#### 1. Sound Recording Sales of *Joseph* and "Close Every Door"

In or about 1969, *Joseph* was recorded by Decca Records and released to the public for

sale. *Id.* at 296; Exh. JJ. "Close Every Door" was the first single released from the 1969 Decca Records *Joseph* album. Trial Tr. at 299. In or about 1971, Sceptre Records released the Decca Records recording of *Joseph*, which included "Close Every Door," in the United States. *Id.* at 296–97; Exhs. JJ, KK. The Sceptre Records sound recording of *Joseph* was recorded and released prior to the February 15, 1972 effective date of the amendment to the Copyright Act extending copyright protection to sound recordings fixed after that date. *See* Trial Tr. at 296–97.

The Sceptre Records sound recording was released in the United States around the time of the popularity and public controversy surrounding Lloyd Webber and Rice's *Jesus Christ Superstar. Id.* at 292, 296–97. In order to benefit from the popularity and success of *Jesus Christ Superstar*, Sceptre Records marketed the *Joseph* sound recording in a manner which implied that it was a follow-up to that work. *Id.* at 297, 311; Exh. JJ.

The Sceptre Records sound recording of *Joseph* was sold in retail stores in the United States. It appeared on the Billboard Magazine charts of "Top LPs" for twelve consecutive weeks, beginning with the week of April 3, 1971, and continuing through the week of June 19, 1971. Trial Tr. at 299–300, 313–14; Exh. KK. The Sceptre Records sound recording of *Joseph* appeared on the Billboard Magazine charts of "Top LPs" at a time when the sound recording of Webber and Rice's *Jesus Christ Superstar* was never lower than number five. Trial Tr. at 300, 314; *see* Exh. KK. The Sceptre Records sound recording of *Joseph* reached its highest point on the Billboard Magazine charts of "Top LPs" the week of May 29, 1971, only two weeks after the sound recording of *Jesus Christ Superstar* reached number one on the same chart. *See* Exh. KK. Although Repp admits he was aware of the Billboard charts of popular music from the time that he was a teenager, Trial Tr. at 191, 221, he claims that he was living in Vienna, Austria between 1969 and 1971, when *Joseph* was on the Billboard Magazine charts, Trial Tr. at 187; Exh. KK.

On March 28, 1974, MCA Records issued a sound recording of the fully expanded and revised *Joseph*, which included "Close Every Door" on side one of the album. Trial Tr. at 299, 414, 418–19; Exhs. SS, TT. A historical sales analysis performed by MCA reflects that from March 28, 1974, the release date of its *Joseph* sound recording, through June 30, 1980, MCA had net sales and distribution of 23,609 units of that sound recording. *See* Exh. SS; *see also* Trial Tr. at 415. This sales analysis set out net unit sales in various interim periods, including net sales and distribution of 16,714 units of the MCA *Joseph* sound recording in the period from March 28, 1974 through April 1, 1979. Exh. SS; *see also* Trial Tr. at 415–16. According to Charles Ciongoli, a financial executive for MCA Records, between 50% and 75% of the total lifetime sales of a theatrical or soundtrack recording such as *Joseph* occur within three to six months after the initial release date of the recording. *Id.* at 413–14. Although the historical sales analysis does not indicate how many, if any, copies of *Joseph* were sold before July 10, 1978, *see* Exh. SS; Trial Tr. at 413, the Court finds it overwhelmingly unlikely that all 16,714 units of net sales and distribution of the MCA *Joseph* sound recording were sold or distributed in the period between Repp's creation of "Till You" in 1978 and April 1, 1979, *cf. id.* at 414–15.

### 2. Sheet Music Sales and Distribution

Novello was an educational music publishing company whose principal business was providing educational materials to schools. *Id.* at 296, 298. Novello sold printed sheet music of *Joseph*, and also of "Close Every Door" individually, in the United States through its agent, Belwin Mills Publishing Company ("Belwin Mills"). *Id.* at 298–99, 398, 400.

During the Access Period Belwin Mills was one of the largest educational music publishing companies in the world. *Id.* at 397. Belwin Mills sold its products primarily to music stores, which in turn sold to the ultimate consumers and purchasers of such musical products, generally schools, churches and individuals. *Id.* at 397. Repp had occasion to visit music stores during the Access

Period, and during such a visit probably saw a print copy of Lloyd Webber's *Jesus Christ Superstar. Id.* at 189.

During the Access Period, Belwin Mills sold approximately 40,000 to 45,000 copies of the printed sheet music of the vocal score of *Joseph* in the United States. *Id.* at 400. Belwin Mills promoted *Joseph* by featuring it on a flyer sent to a subgroup of its general mailing list when the sheet music first became available through Belwin Mills. *Id.* at 398–99.

The vocal score of *Joseph* was listed in and available for order through Belwin Mills's catalogue. *Id.* at 401–02; Exh. RR at 88, 96, 98. Belwin Mills's general mailing list included over 250,000 education and music industry professionals, separated into various categories and classifications. *Id.* at 404. The subgroup of the general mailing list to which the flyers and promotional matters concerning *Joseph* were mailed included 40,000 to 50,000 individuals and organizations comprised of choral directors, church groups and high schools. *Id.* at 404.

Repp has never been able to read sheet music. *Id.* at 427–28. For this reason, he hired Bernard "Chip" Smith to notate his "Till You" music for him. *Id.* at 428; Deposition of Bernard "Chip" Smith, taken Feb. 9, 1993, at 11, 18–19, 39, 58–62, 72–73.

### 3. Amateur and Non–Broadway Performances

Although *Joseph* was intended to be performed by schools, colleges and religious organizations, it came to be performed by stock and amateur theater companies, and ultimately on Broadway. Trial Tr. at 292, 294, 314. *Joseph* was first performed in the United States at the College of the Immaculate Conception in Douglaston, New York in or about 1969 or 1970. *Id.* at 291. In 1974, *Joseph* was performed in Philadelphia's Playhouse in the Park. *Id.* at 294–95; Exh. QQ. On May 8, 1974, the Philadelphia production of *Joseph* was reviewed in *Variety*, an entertainment industry publication, which singled out "Close Every Door" as "the best of all" of the songs in the show. *Id.; see* Trial Tr. at 308.

*Joseph* was produced and presented at the Brooklyn Academy of Music between Decem-

ber 1976 and January 1977. *See* Deposition of William Kennedy, taken Oct. 14, 1992 ("William Kennedy Dep."), at 30–31; Deposition of Mary Lynch Kennedy, taken October 14, 1992 ("Mary Kennedy Dep."), at 9–10; Trial Tr. at 305. During its run, reviews of the Brooklyn Academy of Music production of *Joseph* were published in newspapers including The New York Times, Newsday, and The Christian Science Monitor. *See* Exhs. NN, OO, PP; Trial Tr. at 305–07.

*Joseph* was performed under a license from the authors to Music Theater International, Inc. ("MTI") in amateur and non-Broadway professional productions over 240 times in the United States between May 1977 and May 1978. *See* Exh. T; Trial Tr. at 147–48. Each production of *Joseph* licensed by MTI was obligated by contract to present the entire work as written, including "Close Every Door." *Id.* at 160. There were many amateur and non-Broadway professional productions of *Joseph* during the Access Period, including performances prior to and during the period of MTI's license, that were unlicensed and unreported. *Id.* at 292; *see also id.* at 156–57.

### 4. Radio Airplay

"Close Every Door" was broadcast twice on the radio in the United States in 1971. *Id.* at 140–43; Exhs. R, S. The documented airplay occurred during radio programs with religious themes. *Id.;* Trial Tr. at 140–41. Because "Close Every Door" was included in reports of the American Society of Composers, Authors and Publishers' survey sampling of radio broadcasts from over 10,000 radio stations, the song could have received airplay at other times not included in the surveys. *Id.* at 136–39.

Repp was living in Vienna, Austria on the two documented occasions when "Close Every Door" was played on the radio in the United States. *Id.* at 187; Exhs. R, S.

### B. Repp's Awareness of "Close Every Door"

#### 1. Presence in the United States During the Access Period

Between 1969 and 1971 Repp was living in Vienna. Trial Tr. at 187. During this peri-

od, however, he performed two one-month concert tours in the United States and Canada during this period. *Id.* at 187–88, 213. In each concert tour, Repp performed nearly thirty concerts in different cities throughout the United States and Canada. *Id.* at 187–88, 213–14. It was during one of these concert tours that Repp first heard Lloyd Webber's *Jesus Christ Superstar. See id.* at 179–80, 187–88, 213–14. Repp lived in New York City from September 1972 through the summer of 1973, *id.* at 188, and then resided in Trumansburg, New York, *id.* at 188.

## 2. Repp's Awareness of Lloyd Webber

Repp first heard of Lloyd Webber in or about 1970 when he listened to the sound recording of *Jesus Christ Superstar* with his friend Father Edward Beutner in St. Louis, Missouri. *Id.* at 179–80; Deposition of Father Edward Beutner, taken Oct. 21–22, 1992 ("Beutner Dep."), at 194–96, 199–200. Father Beutner, a Roman Catholic priest, has been Repp's friend for more than 25 years, and in the 1970s arranged concert tours for Repp throughout the United States, including many dates at college campuses and religious organizations. *See* Trial Tr. at 180, 188–89; Beutner Dep. at 11–12, 14–15.

Father Beutner had been asked to critique the recording of *Jesus Christ Superstar,* and invited Repp to listen to the sound recording with him because he believed that Repp had a "good ear" for music. *Id.* at 194–96, 198–99. Upon hearing the sound recording of *Jesus Christ Superstar* with Father Beutner, Repp found the work to be very interesting because it was the kind of music that Repp had been writing for some time. Trial Tr. at 181.

Father Beutner and Repp continued to discuss *Jesus Christ Superstar* and Lloyd Webber after they listened to that work together in or about 1970. *Id.* at 182; Beutner Dep. at 201–02, 219. Repp was aware of the media attention and controversy surrounding Lloyd Webber's *Jesus Christ Superstar* when it was first released in the early 1970s, Trial Tr. at 184–85, and Father Kelly and Repp discussed Lloyd Webber's *Jesus Christ Superstar* during that period, *id.* at 263.

Repp saw both a live stage version and the movie of Lloyd Webber's *Jesus Christ Superstar* sometime between 1969 and 1978. *Id.* at 189; Beutner Dep. at 216–18. Repp received a copy of Lloyd Webber's work entitled *Requiem* as a gift prior to or during this litigation, Trial Tr. at 191, and discussed this work with Father Beutner, Beutner Dep. at 255. Repp also received a copy of the sound recording of Lloyd Webber's work *Phantom of the Opera* as a Christmas gift from his longtime friend and business partner Father William Kelly. Trial Tr. at 191. Father Kelly bought the sound recording of Lloyd Webber's *Phantom of the Opera* as a Christmas gift for Repp because he thought Repp would enjoy it or find it interesting. *See id.* at 266–67.

## 3. Repp's Awareness of *Joseph*

In 1982, approximately four years after registering his copyright in "Till You," Repp attended a live stage performance of *Joseph* at the Corning Glass Center. *Id.* at 178, 212–13, 244–45, 265–66; Exh. 7. He was invited to attend this performance by Mary Lu Walker, Repp's friend and a fellow K & R artist, and her husband. Trial Tr. at 189–90, 245, 266. Repp was aware of the existence of *Joseph* prior to the time that he saw the theatrical production. *Id.* at 178. Repp assumed from the first time he heard the title of the work that it was a musical of a religious nature. *Id.* at 178–79.

Father Beutner bought and listened to a sound recording of *Joseph* during the period 1971–76. Beutner Dep. at 211–13. Father Beutner called Repp during the Access Period and stated that he had listened to *Joseph* and believed that it did not meet the high standards of *Jesus Christ Superstar. Id.* at 225–27.

William Kennedy, a director of K & R, and Mary Kennedy, his wife, are personal friends of Repp and Father Kelly, and are both investors in K & R. William Kennedy Dep. at 3–4, 6, 8, 22; Mary Kennedy Dep. at 5, 7–8, 29–30. William and Mary Kennedy lived in Ithaca, New York between 1976 and 1977, near the town where both Repp and Father Kelly resided. William Kennedy Dep. at 31; Mary Kennedy Dep. at 10, 16; *see also* Trial

Tr. at 235. William and Mary Kennedy, together with their children, attended the live stage production of *Joseph* at the Brooklyn Academy of Music twice in one week sometime between December 1976 and January 1977. William Kennedy Dep. at 30–33; Mary Kennedy Dep. at 9–10. Neither William nor Mary Kennedy could recall whether or not they discussed *Joseph* with Repp upon their return to Ithaca. William Kennedy Dep. at 31–32; Mary Kennedy Dep. at 10.

### 4. Repp's Genre of Composition

Repp was aware of *Godspell,* a musical work based on one of the gospels of the Bible. Trial Tr. at 185–86. Repp became aware of *Godspell* in the 1970s, near the time of its first release, *id.* at 186, and subsequently discussed the work with Father Beutner, Beutner Dep. at 216. Repp places both *Godspell* and Lloyd Webber's work *Jesus Christ Superstar* in the genre of contemporary religious music. Trial Tr. at 181–82, 210–12. The Court finds that Repp had some degree of interest in works of contemporary religious music. Although Repp considers his own music to fall within the category of contemporary liturgical music, *id.* at 175, 181–82, 210–12, the Court finds no meaningful distinction between these two classes of music for the purposes of establishing access.

### 5. Use of the "Door" Metaphor

"Till You" includes the lyric "you opened every door." *See* Exh. B. Of the over 100 songs Repp has written, *see* Exh. AA, three songs other than "Till You" use some manner of "door metaphor," *see* Exhs. 3, 4, 5.

Repp used the phrase "Open your eyes and stand on your feet and walk out that door" in his 1966 composition "Come My Brothers." Trial Tr. at 424–25. Repp used the phrase "Wake up my people and open every door" in his 1967 composition "Wake up my People." *Id.* at 425. Repp used the phrase "Silence is broken by opening your door" in his 1968 composition "Look Out Your Window." *Id.* at 425. These door images were used before the first public perfor-

mance of "Close Every Door," *id.* at 290, which includes the frequently repeated phrase "close every door to me," *see* Exh. C.

### V. Substantial Similarity

"Till You" is comprised of 78 measures in the published sheet music. Trial Tr. at 31; Exh. F. "Close Every Door" is comprised of 108 measures in the published sheet music. Trial Tr. at 32; Exh. G. For purposes of musicological analysis, the songs were divided into two alternating sections of music, Sections A and B. Trial Tr. at 33; Exhs. F, G. Section A of "Till You" consists of the first eight measures of that song and its repeat in variant form in the next eight measures. Trial Tr. at 31, 33–34; Exh. H. Section A of "Close Every Door" consists of the eight measures of that song which follow a four measure introduction, and the repeat of those eight measures in variant form in the eight measures that follow. Trial Tr. at 33–34; Exh. I. In both songs, Section A contains the most "important" music. Trial Tr. at 383–87, 362–65; *see also id.* at 20, 33–34; Exhs. F, G, H, I.

The music contained in Section A of "Till You," including the repeats called for by the music, totals 48 measures of "Till You," comprising more than 50% of that song as published. Trial Tr. at 31–32; Exh. F. The music contained in Section A of "Close Every Door," including the repeats called for by the music, totals 64 measures of "Close Every Door," comprising more than 50% of that song as published. Trial Tr. at 31–32; Exh. G.

Each eight-measure portion of Section A of both "Till You" and "Close Every Door" contains two separate phrases of four measures each: Phrase One and Phrase Two (or its variant). Trial Tr. at 35–39; Exhs. H, I. The melody of Phrase One of both "Till You" and "Close Every Door" begins with the identical interval of a sixth. Trial Tr. at 36–37, 52; Exhs. H, I, N.

When "Close Every Door" is transposed into the pitch level of "Till You," and two grace notes are omitted,[2] Phrase Two of the

---

**2.** The two sixteenth notes C and B lying between the fourth and fifth of the seven common notes in

the second measure of "Till You" are merely ornamental and decorative, and discounting

two songs share seven fundamental melodic pitches in identical consecutive sequence. The identical pitches are, respectively: B, E, G, B, A, G, and F-sharp. Trial Tr. at 24–25, 40–42; Exhs. J, N; *see also* Trial Tr. at 366–70. In addition, Phrase One of "Till You" and Phrase One of "Close Every Door" share five identical fundamental melodic pitches: the first two notes (B and G), the fifth note (C),[3] and the last two notes leading into Phrase Two of each song (C and B). *Id.* at 52–53; Exh. N.

The rhythmic character in the melody of Phrase Two of both songs is similar in that: (1) the basic pulse of both phrases is the quarter note; (2) the relationships between the time values of certain consecutive pitches is similar; and (3) the time values of the first three identical melodic pitches, B, E and G, are identical. Trial Tr. at 47–48; Exh. J.

Despite their common elements, several significant differences exist between the songs. "Till You" is written in the major mode. Trial Tr. at 72–73, 93, 342. The major mode tends to be uplifting and optimistic. *Id.* at 94–95, 342. "Till You" is based on the Magnificat, from the Gospel of Luke in the New Testament, a song of praise to God by the Virgin Mary, *id.* at 335–36, 242, and as such, is an uplifting song, *id.* at 338. "Till You" expresses the Magnificat in contemporary language. *Id.* at 336, 340. "Close Every Door" is written in a minor key signature, *id.* at 93, 342, a mode typically used in, and often associated with, sad music, *id.* at 95, 342. "Close Every Door" is a reflective song that the character Joseph sings immediately after he has been thrown into jail. *Id.* at 289. Joseph's mood is hopeless when he sings the song. *Id.* at 338.

The harmonies used in "Till You" are very simple. *Id.* at 339–40; *see also id.* at 89–90. The harmonies used in "Close Every Door" are complex and extremely sophisticated. *Id.* at 340–41. For example, "Close Every Door" is replete with seventh chords, ninth chords and subdominants, whereas "Till You"

contains none of these sophisticated compositional devices. *Id.* at 340–41.

Similarly, the meters of the two songs are dissimilar. *Id.* at 343–44. The meter of "Till You" is cut time, with four beats per measure and an accent on every other beat, whereas the meter of "Close Every Door" is 3/4, with three beats per measure and an accent on every third beat. *Id.* at 50, 56–57, 95–97, 343–44.

Several differences exist between Phrase One of "Till You" and Phrase One of "Close Every Door." Phrase One of "Close Every Door" consists of the words "Close every door to me; Hide all the world from me." Exh. I; Trial Tr. at 98–99. Phrase One of "Till You" consists of the words "My soul was empty; My body broken." Exh. H; Trial Tr. at 98–99. Moreover, while the three note oscillation at the beginning of Phrase One of "Till You" returns to the initial pitch, the three note oscillation at the beginning of Phrase One of Close Every Door does not. *Id.* at 99. Finally, the third and fourth measures of Phrase One of "Close Every Door" repeat the first and second measures, whereas the third and fourth measures of Phrase One of "Till You" contain a variant of the first two measures. *Id.* at 92–93.

Similarly, Phrase Two of the two songs is dissimilar in several respects. Phrase Two of "Till You" consists of measures five through eight, and Phrase Two of "Close Every Door" consists of measures nine through twelve. *Id.* at 85–89. Phrase Two of "Close Every Door" consists of the words "Bar all the windows and shut out the light." *Id.* at 107. Phrase Two of "Till You" consists of the phrase "My heart had no one till you." *Id.* at 108. With respect to the time values of notes in Phrase Two, there are significant differences in the duration of several similarly pitched notes of the two songs. *Id.* at 110–15.

The first three notes of Phrase Two of "Close Every Door" form a rising arpeggio, or broken chord, a common musical device, particularly in religious music. *Id.* at 117–18,

---

them in ascertaining the fundamental melodic pitches is consistent with common musicological analytical practice. Trial Tr. at 40–42; *see also* Trial Tr. at 370; Exh. J.

**3.** The third note shared by the two songs has been mislabeled in Exh. Q ("Close Every Door") as the fourth note of Phrase One, rather than the fifth. *See* Exh. Q.

344. The rising arpeggio in "Till You" begins on the weak beat, and the rising arpeggio in "Close Every Door" begins on the strong beat. *Id.* at 345. The next four notes of Phrase Two of both "Close Every Door" and "Till You" contain a "descending tetra chord," also an extremely common musical device. *Id.* at 344.

## CONCLUSIONS OF LAW

### I. Standard of Law

■ In order to establish a claim for copyright infringement, a plaintiff must show (1) ownership of a valid copyright;[4] and (2) copying of constituent elements of the work that are original. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 1295–96, 113 L.Ed.2d 358 (1991). In the absence of direct evidence, actionable copying can be inferred from a defendant's access to the copyrighted work and substantial similarity between the two works. *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir.1996); *Laureyssens v. Idea Group, Inc.*, 964 F.2d 131, 139–40 (2d Cir.1992). Where the copyrighted work and the infringing work are "strikingly similar," access to the copyrighted work may be inferred as a matter of law. *Gaste v. Kaiserman*, 863 F.2d 1061, 1067 (2d Cir.1988); *see also Santrayll v. Burrell*, No. 91 Civ. 3166, 1996 WL 134803, at * 2 (S.D.N.Y. March 25, 1996). In establishing infringement, Lloyd Webber is not required to prove that Repp knowingly and willfully set out to copy "Close Every Door" when he composed "Till You." Copyright law makes no distinction between conscious and subconscious copying. *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 998–99 (2d Cir.1983).

### A. Access

■ Access is defined as " '[h]earing or having a reasonable opportunity to hear the plaintiff's work, in other words having the opportunity to copy.' " *Repp v. Lloyd Webber*, 892 F.Supp. at 556; *Sylvestre v. Oswald*, 91 Civ. 5060, 1993 WL 179101, at * 3 (S.D.N.Y. May 18, 1993) (quoting *Intersong–USA v. CBS, Inc.*, 757 F.Supp. 274, 281 (S.D.N.Y.1991)). A plaintiff must offer significant, affirmative and probative evidence to support a claim of access. *Scott v. Paramount Pictures Corp.*, 449 F.Supp. 518, 520 (D.D.C.1978), *aff'd*, 607 F.2d 494 (D.C.Cir. 1979), *cert. denied*, 449 U.S. 849, 101 S.Ct. 137, 66 L.Ed.2d 60 (1980); *see also Intersong–USA v. CBS, Inc.*, 757 F.Supp. at 281. A party can establish access either by demonstrating that (1) the infringed work has been widely disseminated, *see ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d at 998 (2d Cir.1983); or (2) a particular chain of events exists by which the alleged infringer might have gained access to the copyrighted work. *Repp v. Lloyd Webber*, 892 F.Supp. at 556–57; *Sylvestre v. Oswald*, 1993 WL 179101, at * 3.

■ In the present case, Lloyd Webber bases his claim of access primarily on the widespread dissemination of "Close Every Door" during the Access Period. Specifically, Lloyd Webber claims that the following evidence supports the position that "Close Every Door" enjoyed widespread dissemination in the United States: (1) the release of two sound recordings during the Access Period; (2) sales of vocal score sheet music of *Joseph*, including "Close Every Door"; (3) numerous theatrical productions; and (4) radio airplay. In addition, Lloyd Webber points to Repp's close connections to Lloyd Webber's other works and the contemporary religious music genre in general as evidence of access.

First, Repp denies having heard "Close Every Door," or in fact any songs from *Joseph*, until 1982 when he attended a perfor-

---

**4.** Repp's argument that Lloyd Webber failed to demonstrate compliance with the Copyright Act of 1909 is without merit. Lloyd Webber offered into evidence certificates of registration for "Close Every Door" and *Joseph* issued by the United States Copyright Office to Novello, Exhs. V, W, X, Y; Trial Tr. at 165–67, and established an unbroken chain of title in those copyrights from Lloyd Webber and Rice, as authors, to Novello via assignment in 1969, and then to Really Useful by assignment from Novello in 1989, *id.* at 162–67, 296–98; Exhs. II, U. The certificates of registration are prima facie evidence of ownership and validity of the copyrights evidenced therein. 17 U.S.C. § 410(c); *R. Dakin & Co. v. Charles Offset Co.*, 441 F.Supp. 434, 438 (S.D.N.Y.1977).

mance of *Joseph*. As discussed below, the Court has been given no persuasive reason to doubt the veracity of this representation. Second, it appears that the greatest commercial success of *Joseph* occurred after 1980, two years after the creation of "Till You." *See* Trial Tr. at 1, 70, 313. Moreover, Charles Ciongoli testified that under 17,000 copies of *Joseph* were sold prior to April 1979. *Id.* at 416. No evidence was presented as to where or to whom these copies were sold, or how many of the sales occurred before July 10, 1978, the date of copyright registration of "Till You." Third, the impact of evidence of sheet music sales is lessened to a large degree by the fact that Repp cannot read sheet music. *Id.* at 241, 428. Fourth, the evidence presented regarding Repp's interest in a particular genre of composition does not persuade the Court that such interest was acted upon by Repp here.

Finally, with respect to radio airplay, "Close Every Door" was only shown to be played publicly on two occasions. *Id.* at 140–41. First, on a radio station in Hartford Connecticut on July 11, 1971, and second on a radio station in Wheeling, West Virginia on September 5, 1971. *Id.* at 142. Repp lived in Vienna, Austria at the time of these broadcasts, and no evidence was introduced at trial that Repp was near either of these cities on the dates these stations played "Close Every Door." *See Intersong–USA v. CBS, Inc.*, 757 F.Supp. at 281–82 (refusing to find access even where defendants were present in cities where songs were played on radio). For these reasons, the Court finds that the weight of credible evidence does not support an inference of access.

## B. Substantial Similarity

■ In *Arnstein v. Porter*, 154 F.2d 464, 468 (2d Cir.1946), the Second Circuit framed a two-part test for substantial similarity by drawing a distinction between noninfringing "copying," on the one hand, which may be inferred from substantial similarities between the two works, and infringing "illicit copying," on the other, which demands that such similarities relate to protectible material.[5] If copying is found under this first inquiry, only then does the Court consider the issue of illicit copying. On that issue, substantial similarity should be judged by the "spontaneous response of the ordinary lay observer." *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 51 (2d Cir.), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2278, 90 L.Ed.2d 721 (1986); *see also Arnstein v. Porter*, 154 F.2d at 468.

The Court credits the testimony and conclusions of Repp's music expert, James Mack ("Mack"), and finds that Lloyd Webber has not established that Repp copied from "Close Every Door." *See Walker*, 784 F.2d at 48. As a result, the question of illicit copying need not be reached.

■ With respect to Phrase One of "Till You" and "Close Every Door," Lloyd Webber points out that the second note in both songs is a sixth above the first, followed by a descending note, another ascending note, and another descending note. Trial Tr. at 36. These common "oscillations," it is asserted, confine the respective melodies, which are ultimately freed of their tension. *Id.* at 36–38. This extremely general analysis ignores both the words and meters of the phrase, as well as the duration and pitches of several of the notes in question. The Court finds Phrase One of the two songs vastly different in these respects.

5. As the Court has noted in previous opinions in this case, expert testimony on the issue of substantial similarity is generally irrelevant, since the test for illegal copying is based upon the response of ordinary lay observers. *Repp v. Lloyd Webber*, 892 F.Supp. at 557; *see also Denker v. Uhry*, 820 F.Supp. 722, 729 (S.D.N.Y.1992) ("when improper appropriation only is at issue, ... expert testimony ... is irrelevant"), *aff'd*, 996 F.2d 301 (2d Cir.1993). As a threshold matter, expert testimony "may be used to assist the fact finder in ascertaining whether the defendant had copied any part of the plaintiff's work." *Com-* *puter Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 713 (2d Cir.1992). Once some amount of copying has been established, however, the trier of fact must determine whether the copying was "illicit." That is, "whether the 'defendant took from plaintiff's works so much of what is pleasing to [lay observers] who comprise the audience for whom such [works are] composed, that defendant wrongfully appropriated something which belongs to the plaintiff.'" *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d at 713 (quoting *Arnstein v. Porter*, 154 F.2d at 468).

Regarding Phrase Two of the songs, Lloyd Webber claims that the alleged striking similarity of the songs results from the combined effect of the existence of seven consecutive fundamental melodic pitches within that phrase, the similar structural placement of that phrase within the two songs, and the rhythmic and harmonic similarities. Repp forwards a more convincing holistic analysis, however, stressing the different overall mood of the two songs as well as their different meters and modes. In addition, Repp points out the crucial fact that Lloyd Webber's analysis fails to consider differences in the duration of the notes in question, as well as pauses between the notes. Only the first three of the common notes in Phrase Two share the same time values. The duration of the remaining notes in "Till You" are, respectively, one and a half beats, four beats, one beat and four beats. The duration of the remaining beats in "Close Every Door" are, respectively, one beat, one and a half beats, one half beat and one beat. In addition, "Till You" contains a quarter rest between the fifth and sixth notes in the sequence. These differences in timing qualitatively alter the core personality and character of the two songs.

As emphasized by Mack at trial, the thrust and ambience of "Till You" and "Close Every Door" are entirely different. *Id.* at 337. This Court agrees. The songs are set to different meters, *id.* at 50, 56–57, 95–97, 343–44, one is written in the minor mode, and one in the major, *id.* at 72–73, 93, 342, and the rhythms are generally "antithetical," *id.* at 390. Although the songs share some musical devices, such as rising arpeggios and descending tetra chords, such tools are among the most common devices used in music. *Id.* at 117–18, 344. In addition, the fact that the songs share use of a "door metaphor" does not support an inference of copying in the present case. Repp used similar imagery in at least three other works, including works prior to the first public performance of "Close Every Door." *Id.* at 424–25. As a result of these deficiencies, the Court concludes that Lloyd Webber has failed to establish that Repp copied "Close Every Door."

## CONCLUSION

For the reasons set forth above, judgment shall be entered for counterdefendants Repp and K & R on the counterclaims. The foregoing constitutes the Court's findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52(a).

SO ORDERED.